

# CT Corporation

**Service of Process Transmittal**
08/02/2016
CT Log Number 529605684

**TO:** Cammie Koch
Dominion Resources, Inc.
120 Tredegar St
Richmond, VA 23219-4306

**RE:** Process Served in Virginia

**FOR:** Virginia Electric and Power Company (Domestic State: VA)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | DONNA KINSEY, Pltf. vs. VIRGINIA ELECTRIC AND POWER COMPANY, Dft. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Rockingham County Circuit Court, VA<br>Case # 165CL1500187400 |
| **NATURE OF ACTION:** | Personal Injury - Failure to Maintain Premises in a Safe Condition |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Glen Allen, VA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/02/2016 at 09:30 |
| **JURISDICTION SERVED:** | Virginia |
| **APPEARANCE OR ANSWER DUE:** | Within 21 days after such service |
| **ATTORNEY(S) / SENDER(S):** | David S. Bailey<br>The Environmental Law Group, PLLC<br>5803 STAPLES MILL ROAD<br>RICHMOND, VA 23230<br>804-433-1980 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/02/2016, Expected Purge Date: 08/07/2016<br><br>Image SOP<br><br>Email Notification, George W Marget, III  george_marget@dom.com<br><br>Email Notification, Cammie Koch  cammie.g.koch@dom.com<br><br>Email Notification, Susan T. Coleman  susan.coleman@dom.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 4701 Cox Road<br>Suite 285<br>Glen Allen, VA 23060 |
| **TELEPHONE:** | 804-217-7255 |

**EXHIBIT A**

Page 1 of 1 / MJ

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

# COMMONWEALTH OF VIRGINIA



ROCKINGHAM CIRCUIT COURT
Civil Division
80 COURT SQUARE
HARRISONBURG VA 22801
(540) 564-3000

Summons

To: CT CORPORATION SYSTEM
VIRGINIA ELECTRIC AND POWER
COMPANY
4701 COX ROAD
SUITE 301
GLEN ALLEN VA 23060

Case No. 165CL15001874-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Friday, July 29, 2016

Clerk of Court: CHAZ W. HAYWOOD

by _____
(CLERK/DEPUTY CLERK)

Instructions:

Hearing Official:

Attorney's name: BAILEY, DAVID S
5803 STAPLES MILL ROAD
RICHMOND VA 23230

VIRGINIA:

IN THE CIRCUIT COURT FOR THE COUNTY OF ROCKINGHAM

DONNA KINSEY, )
)
    Plaintiff, )
)
v. ) Civil Action No. CL15-1874
)
VIRGINIA ELECTRIC AND POWER )
COMPANY, )
)
    Defendant. )
)
_____ )

## COMPLAINT FOR DAMAGES

Donna Kinsey, by counsel, brings this civil action for personal injury resulting from the unnoticed placement of an electric metering device known as a smart meter on her residence.

### VENUE

Venue is proper in this Court as the Plaintiff's residence and the place where this claim arose are both located in Rockingham County.

### PARTIES

1.     Plaintiff Donna Kinsey is a resident in Rockingham County, owning a home with her husband located at 6910 Miracle Springs Road, Elkton, Virginia. Plaintiff became ill, along with other family members after the Defendant installed, without her knowledge, two smart meters on her property in March 2012. Quickly after the installation Plaintiff began to suffer a host of symptoms having no otherwise identifiable source or diagnosis. After discovery of the smart meters, Plaintiff proceeded along a long course to have the devices removed which did not occur until April of 2014.

Plaintiff remains with many symptoms causing illness and distress and worries constantly about her daughter, who suffered far more sever injury after the smart meters were installed.

2. Virginia Electric and Power Company, which trades as Dominion Virginia Power (hereafter "Va. Power"), is a large electric utility company serving large areas of Virginia, including the Plaintiff's home. As a public utility, Va. Power has the right to trespass upon private property for purposes of electric service, and pursuant to that authority installed two smart meters and a transmission relay device station on the Plaintiff's property as part of an experimental program for meters capable of transmitting signals to a central receiving area, negating in part the need for meter checking and presumably giving Va. Power more information about electric usage in real time.

## BACKGROUND AND INFORMATION

3. Paragraphs 1-2 are realleged and incorporated herein.

4. Plaintiff is a retired police officer who moved to Virginia from Florida in 2009. Plaintiff's family built the home in 2008, which is located at 6910 Miracle Springs Roads near Elkton, Virginia, with her husband, Glen Kinsey and her daughter, Sarah Kinsey.

5. Plaintiff moved into the home in 2009 and lived for years without incident or unusual illness for any family member until March 2012.

6. On or about March 2012, the exact date unknown because the installation was concealed from Plaintiff, Va. Power installed two "smart meters," electrical metering devices developed to independently transmit data on electric use to a receiving tower,

2

on the Plaintiff's property. One meter was installed on a barn about 100 yards from the home, the second meter was installed directly on the side of the house adjacent to living areas, and a transmission relay device was mounted on a nearby utility pole.

7. The house-located smart meter was installed on an exterior wall directly opposite the home office and work area of the Plaintiff, which is the same room that Plaintiff and her husband slept in, and Plaintiff's desk and work area were about 2 feet from the installed smart meter. The transmission relay device is located on a pole about 225 feet from the home.

8. In late March 2012, Plaintiff began to experience a wide range of debilitating symptoms which defied diagnosis. Plaintiff had mood swings, trouble concentrating, insominia, memory loss, ringing in her ears, and hair loss on her head and eye lashes. Plaintiff began crying frequently for no apparent reason, could not sleep or work. Plaintiff had no such health issues before this time.

9. In the fall of 2012, around November, Plaintiff was searching the internet for possible causes of the ringing in her ears, which had become very troublesome. During this search, the internet sources cross connected to smart meters.

10. After looking at the pictures of smart meters on the internet, Plaintiff went outside and discovered for the first time that such a meter was in fact installed on her home.

11. Plaintiff then began a long and detailed effort to communicate with Va. Power to get the smart meters removed but encountered considerable resistance from Va. Power.

12. Virginia Power refused to remove the smart meters asserting that Plaintiff

3

was part of an experimental program, maintained that the meters were safe, and stated that removal would not be considered until a later "opt-out" program was offered, with no date specified when she could opt-out.

13. After Plaintiff continued to complain about adverse health effects experienced by her and her family, a Va. Power representative came to the home and offered to move the smart meter several feet away from the home and place it on a pole. However, the cost of such move, several thousand dollars, would have to be paid by Plaintiff.

14. The representative also said that Va. Power would only be responsible for power to the pole mounted meter, and all connections to the home would be the complete responsibility of the Plaintiff.

15. Plaintiff also learned that her home was the only home in her neighborhood where the Defendant installed smart meters. Unlike the Plaintiff, her neighbors have gated entrances to their properties.

16. Plaintiff retained counsel and an inspection was arranged of the smart meter at Plaintiff's home.

17. Although testing of the home smart meter in April 2013 seemed to indicate the meters were functioning normally, Plaintiff had been told earlier by a Va. Power maintenance person, who inspected the meters prior to the April inspection, that the meters were not working properly. What corrections, if any, were made to the meters at that time is not presently known to Plaintiff.

18. Upon notification of her ability to "opt-out" of the experimental program, Plaintiff immediately responded with written acceptance of the offer to "opt-out".

4

Nothing happened. Plaintiff was eventually contacted by the Defendant asking her whether she wanted to opt-out because the Defendant thought she might want to do so. Finally, the Defendant acted on Plaintiff's second request to "opt-out".

19. However, Va. Power refused to remove the installed smart meter and indicated that instead it would "disable" the transmitting capability of the smart meter as part of the opt-out program. Plaintiff's illness continued.

20. After the meter had been "disabled" by Va. Power, a Va. Power inspector informed Plaintiff that the "disabled" smart meter was not disabled, but was in fact continuing to transmit data and was not working properly.

21. Va. Power finally agreed to remove the smart meter from the home. The replacement meter would be another smart meter with its transmission capability disabled.

22. Plaintiff still suffers serious effects and symptoms for which Plaintiff's medical providers can find no alternative explanation other than her exposure to the electromagnetic emissions from the smart meters.

23. The safety of smart meter systems is controversial, and health effects are still being studied. Nevertheless, the American Academy of Environmental Medicine, a specialized group of doctors and scientists released a position paper on October 23, 2013 that the "peer reviewed, scientific literature demonstrates the correlation between EMF [electromagnetic frequencies] and RF [radio frequency] [also known as radio frequency radiation (RFR)] exposure and neurological, cardiac, and pulmonary disease as well as reproductive disorders, immune dysfunction, cancer and other health conditions" and the "evidence is irrefutable."

5

24. The RF radiation from Wireless Smart Meters is particularly threatening to health because it is so persistent and powerful. Certain smart meters used in California and in Maryland issue pulses of RF radiation, on average 10,000 times per day, and up to a maximum 190,000 times per day, 24/7. The power level of each pulse is about 1000 milliwatts, placing wireless smart meters among the most powerful radio frequency radiators likely to be present in a residential environment.

25. Studies show that pulse modulated RFR causes oxidative injury in liver, lung, testis and heart tissues mediated by lipid peroxidation, increased level of NOx and suppression of antioxidant defense mechanisms.

26. Federal Communications Commission (FCC) regulations protect only against gross overheating and do not protect from biological harm caused by low or "non-thermal" levels of microwaves. Wireless smart meters emit non-thermal levels 24/7.

27. According to the US Environmental Protection Agency, "The FCC's current [radio frequency/microwave] exposure guidelines, as well as those of the Institute of Electrical and Electronics Engineers (IEEE) and the International Commission on Non-ionizing Radiation Protection, are thermally based, and do not apply to chronic, non-thermal exposure situations....the generalization by many that the guidelines protect human beings from harm by any or all mechanisms is not justified." Norbert Hankin of the EPA's Office of Air and Radiation, Center for Science and Risk Assessment, Radiation Protection Division, July 16, 2002.

28. The FCC guidelines can show a device to be unsafe, but cannot prove that a device is safe. Non-thermal levels of exposure are simply not regulated by the

6

FCC.

29. The World Health Organization's International Agency for Research on Cancer (IARC) has classified microwave radiation, specifically including that emitted by smart meters, as a possible Group 2B human carcinogen.

30. There are thousands of peer-reviewed studies showing potentially harmful biological effects of non-thermal levels of microwave radiation. Some of these studies were done with humans, and most were on mammals with nervous systems and biochemistry similar to humans.

31. Wireless smart meters and wireless mesh systems affect human biology and health.

32. No formal research or testing has been done on the effects of smart meter emissions on humans, with the exception of three different surveys which report human sensitization to smart meter emissions resulting in unusual and severe: insomnia, headaches, tinnitus and heart arrhythmias.

33. The terms "electrohypersensitivity" (EHS), or Electrical Sensitivity (ES), have been used to describe a constellation of symptoms, including headache, sleep disturbance, difficulty in concentration, memory disturbance, fatigue, depression, irritability, dizziness, malaise, tinnitus, burning and flushed skin, digestive disturbance, tremor, and cardiac irregularities. Sleep disturbance, headache, nervous distress, fatigue, and concentration difficulties are the most commonly described symptoms. These symptoms are identical to the symptoms of "microwave sickness" described by Russian physicians in the 1950's.

34. In most places they are installed, wireless smart meters create a minor

7

epidemic of Electrical Sensitivity (ES). ES is a kind of physical allergy to electromagnetic fields (EMF). Smart meters seem to be the worst of the sensitizers that initiate ES in previously normal people.

35. After the initial sensitization, smart meter exposure continues to re-trigger the disabling symptoms. Many persons with ES are not able to remain productive members of society, or to find a place that is safe for them to live.

36. From the few studies that have been done on humans, pulses similar to that from smart meters cause changes in brain waves even in persons without symptoms of ES. From thousands of biological studies on the effects of low levels of EMF, it is highly likely that emissions from smart meters affect even the general population. The most noticeable effects in the short-term may be anxiety and insomnia. Also likely are subliminal changes in neuropsychological functions, leakage of the blood-brain barrier, increased oxidative damage including DNA breakage, and susceptibility to auto-immune diseases and cancer.

37. Defendant failed to disclose to Plaintiff that industry experts and scientific study results differ as to the risks and biological effects that arise from smart meter use.

38. Defendant failed to measure and collect the Specific Absorption Rate ("SAR") of the smart meter emissions which is a measurement of how much radiation passes through tissue during a specified time period. Defendant failed to inform that the SAR measurements are not the product of a rigid testing and review, but rather obtained through a self-certification process and measures only the potential thermal aspects of harm from short term exposure as opposed to the potential non thermal aspects of harm from prolonged exposure, which is where the controversy lies.

8

39. All three members of the Kinsey household became sick at a similar time after installation of the smart meters, and have suffered some similar symptoms.

40. Plaintiff retired as a Major in the police force. Plaintiff's rank was third from the command. Among Plaintiff's duties, she supervised over 100 personnel, managed and conducted both the firearms training and the communications operations, and she was responsible for accreditation. Plaintiff also was responsible for drafting police force policies involving high-liability instruction. Plaintiff was a high functioning manager who was capable of multifaceted work.

41. Plaintiff started a consulting business before she retired from the police force through which she provides training and instruction. Since her involuntary exposure to EMF/RFR, Plaintiff has had difficulty concentrating even on one task at a time because her thoughts race around. Plaintiff's condition is depressing to her because she knows what she was capable of before her exposure. Plaintiff's work can be interrupted by spontaneous nose bleeds which she never experienced before in her life. Plaintiff's relationship with her husband has suffered due to the lost desire for intimacy. The injuries have turned Plaintiff's life upside down, and she suffers from a tremendous sense of guilt from being unable to protect her daughter who also has been injured by the involuntary EMF/RFR exposure.

42. Plaintiff also spent thousands of dollars on water testing and other health screenings to try to determine what was making her sick during the time that she thought the meters were disabled and while the meters were in fact still emitting EMF/RFR. Plaintiff also ethernet wired her house to avoid WiFi emissions exposure.

43. Extensive medical evaluations have failed to find alternative causes for

9

the majority of Plaintiff's symptoms, all reasonable alternative causes have been ruled out and Plaintiff's doctor has rendered a causation opinion for exposure to the smart meter emissions.

## COUNT I

## FAILURE TO WARN AND/OR CONCEALMENT OF A POTENTIALLY DANGEROUS CONDITION

44. Paragraphs 1-43 are realleged and incorporated herein.

45. Defendant Va. Power subjected the Plaintiff to an involuntary wireless technology experiment without her knowledge or consent.

46. Defendant Va. Power knew or had reason to know that smart meter technology is controversial, that EMF/RFR emissions from such devices are potentially harmful, and that many adverse health effects were being reported, and that such devices involve an unreasonable risk of harm to the Plaintiff.

47. Defendant Va. Power failed to exercise reasonable care to make safe or warn of the condition and risk, and, in fact, deliberately hid the installation of such device on Plaintiff's home.

48. Plaintiff did not know of such risk and could not have any reason to know or perceive such risk.

49. Defendant Va. Power intentionally and knowing concealed the installation of the smart meter by trick or artifice to avoid controversy and opposition.

50. Defendant Va. Power failed to disclose to Plaintiff that expert and scientific study results differ as to the risks of harm and biological effects that may result from smart meter use.

10

51. Defendant Va. Power's failure to warn and concealment of the smart meter installation was the proximate cause of Plaintiff's exposure to EMF/RFR emissions and consequent injury.

52. Defendant Va. Power is therefore liable to Plaintiff for all injuries suffered as a result of exposure to the smart meter EMF/RFR emissions.

## COUNT II

### ACTUAL OR CONSTRUCTIVE FRAUD

53. Paragraphs 1-52 are realleged and incorporated herein.

54. Defendant Va. Power has the authority to install electric metering devices on residential structures to monitor electricity usage and bill for services. Va. Power has always represented such devices as safe and effective and traditional meters are in such wide use that electric users have come to expect a traditional meter installation.

55. Without notice to Plaintiff, Defendant Va. Power substituted smart meters for the traditional meters on Plaintiff's home and barn.

56. Without notice, Defendant Va. Power is deemed to have constructively represented by its actions to Plaintiff that metering will be accomplished by safe and traditional means known for decades to be safe.

57. Defendant Va. Power's installation of smart meter devices which it knew to be very different from traditional metering devices, and performing functions in a fundamentally different manner causing increased risk of harm, was a deliberate and knowing misrepresentation of the type of service or metering that was being provided.

58. Knowing no different and not being informed of Va. Power's actions,

11

Plaintiff relied upon the long standing representation that electric meters installed on residential homes in general, and Plaintiff's home in particular, were safe.

59. Once the smart meter was installed and discovered by the Plaintiff, Plaintiff was informed that (1) the meter could not be removed; (2) was safe; and (3) if moved at all had to be at Plaintiff's expense. These statements made by Va. Power employees were false, known to be false and intended to mislead Plaintiff.

60. Plaintiff relied on these representations and began a long process seeking an exemption to the experimental Va. Power program, and to seek alternative metering, which greatly delayed the ultimate removal of the meters and caused further exposures until after counsel intervened.

61. Even after the Defendant reportedly disabled the transmitting function of the smart meters, Plaintiff learned from Defendant's representative that the meters were in fact still transmitting data using the RFR functionality. Defendants once again materially misrepresented the status and condition of the meters as disabled, and instead the meters were still continuing to cause harm to Plaintiff and her family.

62. Again, Plaintiff relied on the false and misleading misrepresentation that the transmitting capability of the meters had been disabled, and proceeded on a quest to find other causes of the illnesses, while the meters were actually still transmitting and emitting RFR, all to Plaintiff's detriment.

63. Defendant Va. Power's mis-representations and fraudulent acts were the proximate cause of Plaintiff's injuries, and Defendant is liable to Plaintiff for all such provable injury caused by Defendant Va. Power's fraudulent acts and misrepresentations.

12

## COUNT III

## NEGLIGENCE

64. Paragraphs 1-63 are realleged and incorporated herein.

65. Defendant Va. Power had a duty to Plaintiff, at all times, to act reasonably in the exercise of their broad utility authority, and to exercise such authority in a manner such as to not cause harm or unreasonable risk of harm to other persons and users of their electric services.

66. Defendant Va. Power breached their duty to Plaintiff by installing, without warning, notice or consent, a controversial and potentially harmful smart meter device on Plaintiff's residence.

67. Defendant Va. Power knew that such smart meter devices operated differently from ordinary meters and knew that, unlike ordinary meters, continuously emitted pulsing EMF/RFR.

68. Upon information and belief, Defendant Va. Power had failed to produce, fund or conduct adequate studies of the safety of such smart devices on its own, and if so, did not produce, inform or make available such studies to Plaintiff. Indeed, Defendant Va. Power informed Plaintiff in a February 2013 letter that Va. Power was "studying" reported health concerns, and further informed Plaintiff that the installation of smart meters on her home was part of an "experiment" by Va. Power. Notwithstanding these statements, Va. Power personnel continued to assert that smart meters were "completely safe."

69. Without adequate and comprehensive testing of such devices, Defendant

Va. Power embarked upon installation of smart meters by experiment aimed primarily to serve its own purposes to measure electricity usage and not intended to measure, monitor or evaluate adverse human effects on potentially sensitive people.

70. Defendant Va. Power failed to investigate alternative locations for the smart meter on Plaintiff's residence, and located such meter less than two feet from the work desk and bedroom of Plaintiff, thereby increasing the exposure to Plaintiff and not allowing for a safe distance or protective barrier to such exposure.

71. Defendant Va. Power then furthered its own purposes by opposing, challenging and resisting complaints or concerns by Plaintiff and her family who represented to Defendant that they were adversely impacted by the smart meters.

72. When Defendant finally agreed to disable the transmitting function on the smart meters, Defendant assumed a duty to perform the act with reasonable care. After Defendant purportedly disabled the transmitting capabilities of the meters, the meters were found to still be transmitting.

73. Defendant knew or should have known that the meters were still transmitting data, and the Defendant breach its duty. Plaintiff thought the meters were disabled, and she was confused about why she and her family were still ill. Plaintiff pursued every possible course of investigation and treatment to find out why she was still sick, all while the meters were still transmitting data after she was told by Defendant that the meters had been modified.

74. The above actions of Defendant Va. Power breached their duties to Plaintiff to exercise its authority in a reasonable manner so as not to cause harm.

75. The above breaches of duty by Defendant Va. Power were the proximate

14

cause of the injuries to Plaintiff and Defendant Va. Power is liable to Plaintiff for all such injuries caused thereby.

## RELIEF REQUESTED

Plaintiff asks the Court to award Plaintiff such damages as are appropriate for medical injury, pain and suffering, emotional distress and other compensatory damages as may be proper in the amount of $3,500,000.00 and such other damages as the Court may deem proper.

A JURY TRIAL IS REQUESTED

Respectfully submitted,

Donna Kinsey
By counsel

David S. Bailey, Esquire (Va Bar 24940; DC Bar 455518)
The Environmental Law Group, PLLC
5803 Staples Mill Road
P.O. Box 6236
Richmond, Virginia 23230
Telephone: 804-433-1980
Facsimile: 804-433-1981
email: dbailey@envirolawva.com

Tammy L. Belinsky, Esquire (Va Bar 43424)
The Environmental Law Group, PLLC
9544 Pine Forest Road
Copper Hill, Virginia 24079
Telephone: 540-929-4222
Facsimile: 540-929-9195
email: tbelinsky@envirolawva.com

August 20, 2015

15